*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re E. KRAJENKE, Minor.

UNPUBLISHED
August 10, 2023

No.   363662
Sanilac Circuit Court
Family Division
LC No.   16-036050-NA

Before:  BOONSTRA, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Respondent[1] appeals by right the trial court's order terminating his parental rights to his minor child, EK, under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).  We affirm.

## I.  PERTINENT FACTS AND PROCEDURAL HISTORY

EK was born in 2015.  In 2016, the Department of Health and Human Services ("DHHS") petitioned the trial court to take jurisdiction over one-year-old EK and his five minor half-siblings, and removed them from their mother's care and the care of their respective fathers.  As a consequence, EK was removed from respondent's care in November 2016 and placed in a nonrelative foster home.  In 2017, the trial court terminated its jurisdiction and returned two-year-old EK to respondent's and his mother's care.

In July 2020, EK's mother left two of her children in the care of a family friend, and while in this individual's home at least one child witnessed a visitor in the home die from an apparent drug overdose.  At that point, DHHS again petitioned the trial court to take jurisdiction of the children, including four-year-old EK.  The petition alleged, among other things, that respondent knew that EK's mother used heroin and methamphetamine and knew of the poor condition of her home, and had failed to protect EK when he left the child in his mother's care.  DHHS also secured ex parte removal orders for the children.

---

[1] EK's mother was also a respondent in the proceedings below.  Her parental rights were terminated by the trial court in January 2023.  EK's mother is not a party to this appeal.

After filing the petition and obtaining removal orders, DHHS located several of EK's half-siblings in the home of an extended family member. The children were filthy and in poor condition. EK, however, was not with his half-siblings. Both respondent and EK's mother represented to DHHS and the trial court that they did not know EK's whereabouts. Two days later, however, law enforcement found EK in his mother's car, along with drugs and drug paraphernalia. EK was dirty and his clothes were filthy and ill-fitting.[2]

In October 2020, respondent entered a plea of admission to the allegations in the petition, admitting that because of his own continued criminality, substance abuse, and instability, he had failed to protect EK. In particular, respondent admitted that he was aware of EK's mother's substance use, physical neglect, and improper supervision of the children when he left EK in her care. The trial court ordered respondent to comply with a case service plan designed to improve his parenting skills, address his mental health[3] and substance abuse issues, and ensure that EK would have a safe and stable home environment. In May 2022, approximately 18 months later, DHHS filed a supplemental petition alleging that respondent had failed to benefit from services.

At May and September 2022 hearings on the supplemental petition, DHHS presented evidence that during the two years EK had been in foster care, respondent did not meaningfully participate in and benefit from his treatment plan. Respondent was required to obtain and maintain suitable housing, maintain contact with the caseworker, attend parenting time, submit to random drug screens, participate in parenting education classes, comply with service referrals, and maintain employment. Early on in the proceedings, DHHS provided respondent with the assistance of a supportive visitation coach. DHHS also referred respondent to the Family Skills program. Five months after that referral, the service was "closed unsuccessfully" because respondent did not make sufficient progress toward his goals. The service provider expressed concerns regarding respondent's mental health and his inconsistent attendance.

Following his discharge from the Family Skills program, respondent's caseworker referred him to the Life Skills program in July 2021. This program was designed to work with respondent on conflict resolution, child-appropriate expectations, self-sufficiency, family planning, anger management, communication skills, career planning, and role modeling. Although respondent completed the program in October 2021, the service provider noted that he made "limited progress" toward the goals of positive parenting and expressing emotions appropriately.

Respondent was offered parenting time twice per week. When visits were permitted, he did not consistently attend. The caseworker testified that when respondent did attend visitation, he was more interested in playing on his phone than engaging with EK. When EK would try to get respondent's attention, respondent would "brush" him off with indifference. Notwithstanding

---

[2] When EK came into care, he was not vaccinated, had extensive tooth decay, and was diagnosed with post-traumatic stress disorder (PTSD) and adjustment disorder.

[3] Respondent was previously diagnosed with major depressive disorder, PTSD, cannabis use disorder, attention-deficit/hyperactivity disorder (ADHD) and panic disorder. He was also prescribed psychotropic medication. His 2020 psychological determined, however, that he had no mental health diagnoses that would impair his ability to parent EK.

the issues with parenting time, respondent completed a supportive visitation program in May 2021, and was eventually granted unsupervised weekend visitation with EK. Within a few months, however, EK returned from visits reporting that he had witnessed verbal and physical fights between respondent and his live-in girlfriend, MS. A safety plan was implemented that required MS to leave the home during EK's visitations, but EK continued to report that she was in the home during his visits. EK also reported that respondent told him not to speak with the caseworker about events in the home and instructed him to give the worker "the middle finger" if they tried to talk to him. There was also testimony that EK grew increasingly troubled by respondent's conduct and began exhibiting serious behavioral issues. Both EK's foster mother and the caseworker noticed a correlation between parenting time and EK's toileting issues. Although EK was then five years old, he was soiling his pants immediately before, during, and after parenting time with respondent.

After an unsupervised visit in mid-July 2021, EK's foster mother heard respondent yelling at EK. Respondent told EK that DHHS was blaming him for EK's toileting issues and yelled that if they continued, DHHS would take EK away, place him with strangers, and not allow him to see respondent. EK's foster mother reported the incident, and respondent's visitation was returned to only supervised visits. In November 2021, the trial court suspended respondent's visitation after finding that EK was being harmed by the visits with respondent.

Additionally, respondent was notified of and invited to attend EK's therapy sessions, but he only attended one session in November 2021. According to EK's therapist, during that session, respondent did not appropriately interact with EK. Instead, he spent the majority of the appointment airing his grievances with DHHS to the therapist.

After the adjudication and disposition, DHHS referred respondent to Community Mental Health (CMH) for mental health treatment in July 2020. Respondent did not participate in the intake process or attend his first therapy session until December 2020. In the months that followed, respondent participated, albeit inconsistently, in biweekly individual therapy sessions with CMH. The caseworker testified at the termination hearing that she last spoke to respondent's counselor in April 2022, and that the counselor had reported that respondent was maintaining the "status quo" and that, while he continued to need services, there were no "drastic concerns."

Early in the case, it became apparent that domestic violence in respondent's home was a barrier to reunification. During the first review hearing in January 2021, concerns were raised about respondent's relationship with MS. In the fall of 2020, MS posted on Facebook that respondent had physically assaulted her while she was pregnant with his child, and she posted photos of her bruised and battered face. In November 2020, MS gave birth to respondent's child. Sometime thereafter, MS and respondent reconciled and resumed living together. Although respondent and MS denied any domestic violence, EK reported to both his foster mother and the caseworker that he had seen respondent put MS's head through a wall and push her face into her son's urine. Concerned about domestic violence, DHHS referred respondent and MS to couples counseling in April 2021. The two initially agreed to attend the counseling, but the counseling service was terminated in September 2021 because respondent and MS both failed to consistently attend their appointments.

At the termination hearing, the trial court held that DHHS had proven, by clear and convincing evidence, the existence of statutory grounds to terminate respondent's rights to EK

under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). The trial court noted that, initially, respondent was not compliant with his treatment plan, but that his participation had improved since the supplemental petition for termination had been filed. However, the trial court noted that respondent only made progress when the "heat was on." It questioned whether respondent would continue to make progress if not under the imminent threat of termination. Ultimately, the trial court held that respondent had not benefited much from the services offered and that he would not implement what he had been taught. The trial court further found that EK's reports to the caseworker that he had seen respondent physically abuse MS were credible.

The trial court further concluded that termination of respondent's rights was in EK's best interests. The trial court held that the bond between respondent and EK was minimal, and that EK suffered from behavioral issues and toileting issues as a result of his interaction with respondent. The trial court noted that EK's toileting issues had improved and he was doing better in school since being placed in foster care.

The trial court entered an order terminating respondent's parental rights to EK as described. This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court erred when it found statutory grounds to terminate his parental rights. We disagree.

This Court reviews for clear error a trial court's finding that at least one statutory ground for termination has been proven by clear and convincing evidence. MCR 3.977(K); *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's rights to EK under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), which permit termination of parental rights under the following circumstances:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The record clearly and convincingly demonstrates that at the time of termination, the conditions that led to the adjudication continued to exist and there was no reasonable likelihood that those conditions would be rectified within a reasonable time given the child's age. MCL 712A.19b(3)(c)(*i*). DHHS first removed EK in 2016, returned him in 2017, and, then, removed him for a second time in 2020. The original petition alleged that respondent had prior CPS involvement for alleged sexual abuse, failure to protect, improper supervision, threatened harm, substance abuse and physical abuse. It also alleged that respondent is a registered sex offender and failed to register as required. Further, the petition alleged that he knowingly permitted EK to reside with the child's mother despite being cognizant that she was an active drug user who lived in deplorable conditions and failed to protect the child.

Respondent was first offered services to improve his parenting skills in 2016. After the petition in this case was filed, the trial court again ordered respondent to comply with a treatment plan. Respondent had more than two years to make changes in his life, but he did not take advantage of the opportunities provided to him. While DHHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondent to participate in and benefit from the services that are offered. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). The record shows that respondent failed to adequately address numerous barriers to reunification, including domestic violence, parenting skills, and demonstrating the ability to keep EK safe from harm. For the majority of the proceedings below, respondent refused to participate in most services offered to him. Only when a supplemental termination petition was filed did respondent begin to regularly participate in services. However, the record shows that respondent refused to address the issue of domestic violence and exposing EK to that violence and he continued to deny that domestic violence occurred in his romantic relationship despite EK's reports and MS's Facebook posts. Further, despite the agreed-upon safety plan requirement that MS leave the house when EK was present for unsupervised visits, MS continued to be present during those visits, and respondent instructed EK to lie to DHHS about her presence. This conduct raises significant concerns about respondent's ability or willingness to protect EK by removing him from unsafe situations or by making EK's home safe and secure.

-5-

Accordingly, the record supports the trial court's finding that respondent gained no insight into the issues that separated him from EK. We therefore conclude that the trial court did not clearly err by holding that the conditions that led to adjudication continued to exist and there was no reasonable likelihood that the conditions would be rectified within a reasonable time given EK's age (nearly 7 years old) and given that EK had spent about one-half of his young life in care. MCL 712A.19b(3)(c)(*i*); *Trejo*, 462 Mich at 355.

Admittedly, in the few months before the beginning of the termination hearing, respondent began to participate more regularly in some services. In particular, respondent's attendance at his biweekly therapy through CMH became more consistent. Respondent also completed a parenting class. Although respondent's efforts were commendable, there is nothing to suggest that they were evidence of long-term change or that he benefitted from these services. Respondent was given two years to demonstrate progress and failed to do so. Moreover, even with respondent's renewed efforts, he refused to address significant issues such as domestic violence in his romantic relationship with MS and EK's serious behavioral problems that were linked to respondent's parenting-time visits. Further, when he did attend counseling, respondent continued to spend a great deal of time airing his grievances concerning DHHS rather than attempting to learn and benefit from the services provided. Accordingly, despite respondent's "last ditch efforts," the trial court did not clearly err by holding that there was no reasonable likelihood that the conditions that led to the adjudication would be rectified within a reasonable time considering EK's young age. MCL 712A.19b(3)(c)(*i*); *Trejo*, 462 Mich at 355.

Termination of parental rights is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). As discussed, DHHS met this evidentiary burden by clear and convincing evidence. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under § 19b(3)(c)(*i*). And "[b]ecause termination of parental rights must be supported by at least one statutory ground, we need not address the additional grounds for termination. *In re Jackisch/Stamm-Jackish*, 340 Mich App 326, 338; 985 NW2d 912 (2022).

### III. BEST-INTEREST DETERMINATION

Respondent also argues that the trial court erred by finding that termination of his parental rights was in EK's best interests. We disagree.

This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *Jones*, 286 Mich App at 129. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2001). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's

-6-

well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The trial court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). "The trial court should weigh all the evidence available to determine the children's best interests." *White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id.* at 90.

In this case, a preponderance of the evidence supports the trial court's finding that termination of respondent's parental rights was in EK's best interests. It is apparent that EK would be at risk of harm in respondent's unsupervised care. Respondent had not substantially participated in or benefited from his treatment plan. His failure to improve his parenting skills, address his mental health concerns, and resolve domestic violence issues demonstrates that EK would not be safe in respondent's care.

EK has been diagnosed with attention-deficit hyperactivity disorder. A provider testified at the termination hearing that he will require continued mental health care and medication reviews. He also will require a stable environment with structure and predictability. There was little evidence that respondent could provide for these needs. Respondent refused to consent to the administration of medication recommended by EK's treating psychiatrist. Consequently, the caseworker was required to obtain court authorization for the administration of the medication. Further, respondent was notified of and invited to attend EK's weekly therapy, but he took advantage of this opportunity on only one occasion. Even then, respondent was more concerned about his own grievances with DHHS than EK's well-being. Considering respondent's unwillingness to attend EK's therapy appointments, and his lack of engagement during the one appointment that he did attend, it is reasonable to conclude that he would not act in EK's best interests regarding EK's mental health treatment. Further, because respondent was unwilling to participate in his own services to reunite with EK, the trial court reasonably could conclude that he would not be motivated to ensure that his child received necessary medical care and treatment.

There was also evidence that EK would be at risk of emotional and physical harm because of the domestic violence in respondent's home. EK reported that he had witnessed respondent physically abuse MS. This exposure to violence caused EK to understandably express an increasing fear of respondent. Respondent was offered services to address issues of domestic violence and anger management, but he refused to meaningfully participate in these services.

Respondent argues that he has a strong parent-child bond with EK. However, the evidence overwhelmingly demonstrates that EK feared respondent and was distressed and anxious during and after his visits. EK's therapist noted that a minimal bond existed between him and respondent. The therapist also described how EK feared the possibility of being alone with respondent. Similarly, EK's foster mother testified that when EK knew a visit was coming or when he saw respondent's truck pull up, he would hide. The record does not support respondent's contention that a strong bond existed between him and his child.

There was also strong evidence that EK would endure continued emotional harm in respondent's care. EK's foster mother testified that the pediatrician diagnosed EK with stress-related encopresis.[4] She further testified that EK typically had toileting accidents before, during, and after visits with respondent. When the trial court suspended respondent's parenting time, EK's toileting issues ceased almost immediately. This evidence supports a correlation between EK's stress-related toileting issues and contact with respondent.

Respondent notes that EK's foster mother is not willing to adopt him, and argues that terminating his parental rights was therefore not in EK's best interests. We disagree. When balancing the best-interest factors, a court may consider the advantages of a foster home over the parent's home and the possibility of adoption. *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). The evidence supports a finding that EK was thriving in his current foster home. While that caregiver was not willing to plan long term and permanently care for EK, she testified that another individual, CK, was willing to do so. The foster mother explained that CK was respondent's former girlfriend and the mother of one of respondent's other children. There was evidence that EK had a strong bond with CK and considered her a mother-figure. Moreover, even though EK was only seven years old, he indicated that he did not want to live with respondent. Accordingly, while EK's foster mother was not willing to adopt him, there was evidence that another individual was willing to plan permanently for him. The record supports a finding that respondent was not able to parent his child and would not be able to do so within a reasonable time. By contrast, EK was thriving in his current placement and would likely do well in the care of CK.

The trial court did not clearly err when it found that termination of respondent's parental rights was in the EK's best interests. *Jones*, 286 Mich App at 129.

Affirmed.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Kathleen A. Feeney

---

[4] Respondent yelled at EK when he soiled his pants at visits and told EK it was his fault that visits were back to being supervised again. Moreover, respondent often refused to clean up EK, but told the foster parent that EK wet his pants.